# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MAGDALENA T. BASSETT; DENMAN J. BASSETT; and OLYMPIC RESOURCE PROTECTION COUNCIL, | No. 51221-1-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF ECOLOGY, | PUBLISHED OPINION |
| Respondent, | |
| CENTER FOR ENVIRONMENTAL LAW & POLICY, | |
| Intervenor. | |

MELNICK, J. — The Dungeness River in the Olympic Peninsula flows 32 miles from the Olympic Mountains north into the Strait of Juan de Fuca. The river and its watershed are home to numerous species of salmon and trout, including endangered Chinook and summer chum salmon, steelhead, and bull trout. Water from the Dungeness watershed has been scarce for decades and critically low stream flows in the summer and fall have proven detrimental to recovery of endangered fish populations.

In 2005, the Elwha-Dungeness Planning Unit enacted a watershed plan, seeking to address the situation and make water management recommendations to the Department of Ecology (DOE) for regulation of the Dungeness Basin.

In November 2012, DOE promulgated an administrative rule (Dungeness Rule) that regulated the use and appropriation of all surface and groundwater in the watershed. The Dungeness Rule established minimum instream flows (MIFs) for the Dungeness River and its tributaries, required mitigation and metering for all new water appropriations, including permit exempt wells (PE wells), and closed the basin to new surface water withdrawals for part of the year.

Clallam County property owners Magdalena Bassett and Denman Bassett, and the Olympic Resource Protection Council (ORPC),[1] a non-profit corporation who seeks to balance environmental protection with private property rights, (collectively "plaintiffs") challenged the Dungeness Rule in superior court, claiming that it failed to meet procedural and substantive Administrative Procedures Act (APA) requirements. The court upheld the rule and the plaintiffs appeal.

DOE neither exceeded its statutory authority nor violated any required rulemaking procedures. In addition, the Dungeness Rule is not arbitrary and capricious. We affirm.

FACTS

I. DUNGENESS RULE

In November 2012, DOE filed the Dungeness Rule with an effective date of January 2, 2013. WAC 173-518-010. To protect low stream flows and existing water rights, DOE found that water was not reliably available for new consumptive uses in the Dungeness watershed. WAC 173-518-050. DOE wanted to satisfy present and future human needs, retain natural surface water bodies in the watershed, protect instream values and resources, and implement its obligations under the local watershed plan. WAC 173-518-020.

---

[1] The Bassetts are members of the ORPC.

The Dungeness Rule established MIFs[2] for the Dungeness River and its tributaries. It also heavily regulated access to surface water and groundwater in the basin. We begin by detailing the primary effects of the rule.

A.      INSTREAM FLOWS AND RESERVES

The Dungeness Rule established MIFs for the Dungeness River and eight smaller creeks in the basin. WAC 173-518-040 & Table II. These MIFs became appropriations of water under the prior appropriation doctrine[3] so that future appropriations could not disturb them. *See* WAC 173-518-040(3); RCW 90.03.345. DOE based the MIFs on recommendations of the 2005 Elwha-Dungeness Watershed Plan, discussed further below. WAC 173-518-040(1), (2). DOE's objective in establishing MIFs was the protection and preservation of wildlife, fish, scenic, aesthetic, and other environmental and navigational values.

DOE also established reserves of groundwater, not subject to the MIFs, specifically for domestic use.[4] WAC 173-518-080. DOE found that the public interest in access to domestic water overrode potential impacts to instream resources. WAC 173-518-080. Domestic water users who

---

[2] MIFs are appropriations of water to the stream, set by rule, to guarantee future water availability in the basin, continued existence of the stream, and protect and preserve instream resources and values. The rule uses the term "instream flow" to mean the same as "base flow," "minimum flow," and "minimum instream flow" as used in various statutes. WAC 173-518-030.

[3] An "appropriation" is a term of art meaning "the assignment of a permanent legal water right," under prior appropriation doctrine. *Foster v. Dep't of Ecology*, 184 Wn.2d 465, 473-74, 362 P.3d 959 (2015). Prior appropriation doctrine is the cornerstone of Washington water law. Fundamentally, it is the "long-standing principle that water appropriations have priority over other appropriations acquired later in time: 'as between appropriations, *the first in time shall be the first in right*.'" *Fox v. Skagit County*, 193 Wn. App. 254, 264, 372 P.3d 784 (2016) (quoting RCW 90.03.010)). We discuss its influence on this case at length below.

[4] "Domestic use" is use of water "associated with human health and welfare needs," and it includes "drinking, bathing, sanitary purposes, cooking, laundering, and other incidental household uses." WAC 173-518-030.

complied with a list of DOE conditions could use water from the reserves for their domestic needs, despite potential impacts to MIFs. WAC 173-518-080(2). The rule forbade any consumptive use[5] from impacting MIFs unless it came from the groundwater reserve or was subject to mitigation, as discussed below. WAC 173-518-040(5).

### B.    CLOSURES AND MITIGATION

Because of water scarcity, DOE determined that surface water was not reliably available for new consumptive uses in the basin. The rule closed year-round eight specific tributaries as well as all unnamed tributaries to the Dungeness River. WAC 173-518-050. It also closed the Dungeness River mainstem between July 15 and November 15 every year. WAC 173-518-050.

Surface water and groundwater sources within the Dungeness watershed are hydraulically connected. WAC 173-518-070(1). Accordingly, the Dungeness Rule closed the watershed to new groundwater appropriations, including new permit-exempt wells,[6] subject to three specific exceptions. WAC 173-518-070. A new prospective groundwater user would be required to either (1) use the water for a nonconsumptive use; (2) demonstrate scientifically to DOE's satisfaction that the use would not adversely affect any closed surface waters; or (3) obtain mitigation.[7] WAC 173-518-070(3).

---

[5] A "consumptive use" is any use of water that "diminishes the volume or quality of the water source." WAC 173-518-030.

[6] Most appropriations of groundwater require a permit from DOE, subject to RCW 90.44.050. However, groundwater withdrawals of less than 5,000 gallons per day for certain uses do not require a permit. RCW 90.44.050. The Dungeness Rule's effects on PE wells are discussed further below, as they are among the primary disputes in this case.

[7] Mitigation is "action taken to offset impacts from future water appropriations on closed surface water bodies or senior water rights" including MIFs set by the rule. WAC 173-518-030.

To obtain mitigation, the rule established a Dungeness water exchange, through which new users could purchase credits to offset any new consumptive water use. WAC 173-518-070(3)(a)(i). Alternatively, new consumptive users could propose their own mitigation plan. WAC 173-518-070(3)(a)(ii), -075. Mitigation plan requirements included that new consumptive water uses not impair any existing water rights. WAC 173-518-075(2)(a).

Finally, the rule required metering of all future new surface water and groundwater appropriations in the basin. WAC 173-518-060.

## II. PASSAGE OF RULE

### A. BACKGROUND

The Dungeness watershed included parts of Clallam and Jefferson counties around the Dungeness River, near Sequim. The Dungeness mainstem averaged a flow of 701 cubic feet per second during June and 171 cubic feet per second in September, the months with the highest and lowest streamflows, between 1924 and 2011. Historically, irrigators diverted up to 80 percent of the Dungeness's natural flow. In 1998, companies and irrigation districts began to voluntarily limit their diversions to no more than 50 percent of the river.

In January 2012, groundwater levels were declining due to variations in rainfall, changes in irrigation practices, irrigation ditch piping, and increased well withdrawals associated with population growth. Approximately 14,000 wells and well hookups withdrew about 5.98 million gallons per day (gpd), 2.71 million gpd of which was consumptive. This amount did not include uses for irrigation, golf course, dairy, or industrial water.

#### 1. Elwha-Dungeness Watershed Plan

In 2005, the Elwha-Dungeness Planning Unit, consisting of Clallam County, the City of Port Angeles, the Elwha Klallam Tribe, the Jamestown S'Klallam Tribe, the Agnew Irrigation

District, and DOE adopted the Elwha-Dungeness Watershed Plan (Plan). The Plan assessed the status of water resources in Water Resource Inventory Area (WRIA) 18, the area ultimately affected by the Dungeness Rule, and addressed competing demands for water within the WRIA.

The Plan was the result "of a lengthy, collaborative, and consensus-based process involving all key stakeholders in the watershed." Administrative Record (AR) at ECY069806. It addressed water quantity, water quality, habitat, instream flows, stormwater, land use and management, education and outreach, and watershed management.

The Plan suggested strategies for water management in the Dungeness Basin, including protection of instream flows and limitation of PE wells. It recommended that continued groundwater withdrawals be conditioned on mitigation to surface water impacts and increased regulation of PE wells. It suggested the creation of a groundwater reserve to facilitate land use planning, manage growth, and protect instream flows.

A "central purpose" of the Plan was "to recommend instream flows for streams and rivers within the WRIA, for use by [DOE] as rule-making discussions beg[a]n." AR at ECY070473. The planning unit found that river flows were critical to fish at all lifestages and that optimal volume and timing of flows provide numerous ecological benefits to fish. The Plan's recommended instream flows intended to condition new water rights in the basin on maintenance of the regulatory instream flow level in the river.

The Plan recognized the over-appropriation of water in the basin. It observed that some streams had water rights exceeding natural flows in low flow seasons and instructed DOE, "through its rule-making procedure, [to] adopt instream flow levels and then use them in its management of subsequent water rights applications for WRIA 18 streams." AR at ECY070473. It proposed specific instream flow numbers for numerous streams in the basin, including the

Dungeness mainstem. These recommended numbers are identical to those DOE ultimately adopted in the Dungeness Rule.[8] WAC 173-518-040, Table II.

2. Dungeness Rule

In 2006, DOE began working with the local community in eastern Clallam County to draft the Dungeness Rule's language. It put development of the rule on hold in late 2010 while local water resource managers focused on issues outside the scope of the rule. In February 2011, DOE agreed with Clallam County and the Sequim-Dungeness Water Users Association (WUA) that it would have a rule in place by August 2012.

DOE filed a proposed version of the Dungeness Rule on May 9, 2012, held a public hearing on the rule on June 28, and left the public comment period open until July 9. In November 2012, DOE filed a concise explanatory statement, describing the rule's effects and responding to each of the hundreds of public comments. DOE published the final rule on November 16. It went into effect on January 2, 2013.

B. COST-BENEFIT AND LEAST BURDENSOME ALTERNATIVE ANALYSES

Alongside the final rule, DOE published a final cost-benefit analysis (CBA) which determined that, over a 20 year period, the Dungeness Rule would cost between $9.4 million and $26.1 million and provide between $32.1 million and $79.7 million in benefits. DOE maintained that the CBA was optional because the Dungeness Rule was not a significant legislative rule.

DOE also published a least-burdensome alternatives (LBA) analysis, in which it determined that the Dungeness Rule as written was the least burdensome out of seven alternatives.

---

[8] The Rule did not adopt MIFs for every stream for which the Plan recommended MIFs, but those it did adopt were all identical to the levels suggested in the Plan.

DOE did not perform a separate analysis to determine whether the rule produced the maximum net benefits.

### III.   LEGAL CHALLENGE

Under the Dungeness Rule, the Bassetts could not obtain a water right for their Clallam County property which reduced its value.

In January 2014, ORPC formally requested that DOE amend the Dungeness Rule, claiming that the rule was inconsistent with state law and established precedent. Specifically, it attacked DOE's use of the overriding considerations of public interest (OCPI) exception to create reserves of water and DOE's establishment of MIFs in the Dungeness watershed without applying either a maximum net benefits test or the four-part test for new water appropriations. DOE denied the petition on March 18.

In December 2014, the Bassetts and ORPC filed a petition for a declaratory judgment that the Dungeness Rule was invalid. The Center for Environmental Law and Policy (CELP) intervened as a defendant. In December 2016, the superior court concluded that the plaintiffs had not met their burden to show the Dungeness Rule was invalid and dismissed the petition with prejudice.

Plaintiffs petitioned for direct review at the Supreme Court. After briefing was complete, the Supreme Court transferred the case to this court.

### ANALYSIS

### I.   LEGAL PRINCIPLES

#### A.   ADMINISTRATIVE RULE CHALLENGE

The party challenging a rule has the burden of establishing that it is invalid. *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 580, 311 P.3d 6 (2013). Under the APA,

we must declare an administrative rule invalid if "[t]he rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious." RCW 34.05.570(2)(c). In reviewing administrative action, "we sit in the same position as the trial court and apply the [APA] standards directly to the agency's administrative record." *Granton v. Wash. State Lottery Comm'n*, 143 Wn. App. 225, 231, 177 P.3d 745 (2008) (footnote omitted).

Rules that are "'reasonably consistent with the controlling statute[s]'" do not exceed statutory authority, but rules inconsistent with their implementing statutes are invalid. *Swinomish*, 178 Wn.2d at 580-81 (quoting *Wash. Pub. Ports. Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 646, 62 P.3d 462 (2003)). An agency's action is arbitrary and capricious if it "is the result of willful and unreasoning disregard of the facts and circumstances." *Providence Hosp. of Everett v. Dep't of Soc. & Health Servs.*, 112 Wn.2d 353, 356, 770 P.2d 1040 (1989). The majority of plaintiffs' challenges are allegations that DOE exceeded statutory authority or violated statutory rulemaking procedures.

B. STATUTORY INTERPRETATION

We review questions of statutory interpretation de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). In interpreting statutes, "we give effect to the plain meaning of the language used as the embodiment of legislative intent." *Swinomish*, 178 Wn.2d at 581. We give effect to the plain meaning of the statute as "derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

If a statute's meaning is plain on its face, we give effect to that meaning as an expression of legislative intent. *Blomstrom v. Tripp*, 189 Wn.2d 379, 390, 402 P.3d 831 (2017). However, if, "after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history." *Blomstrom*, 189 Wn.2d at 390. Although we generally accord substantial deference to agency decisions, "we do not defer to an agency the power to determine the scope of its own authority." *In re Elec. Lightwave, Inc.*, 123 Wn.2d 530, 540, 869 P.2d 1045 (1994).

### C. WASHINGTON WATER LAW

Evaluation of statutory provisions concerning water rights "almost always requires consideration of numerous related statutes in the water code." *Swinomish*, 178 Wn.2d at 582. In this case, we are asked to interpret provisions of the water code, the Water Resources Act of 1971 (WRA), the Minimum Water Flows and Levels Act (MWFLA), the Watershed Planning Act (WPA), and the Regulation of Public Groundwaters. We begin by reviewing the fundamentals of Washington water law.

#### 1. Prior Appropriation Doctrine

Washington follows the prior appropriation doctrine of water rights, summarized: "'as between appropriations, *the first in time shall be the first in right*.'" *Fox v. Skagit County*, 193 Wn. App. 254, 264, 372 P.3d 784 (2016) (quoting RCW 90.03.010).

The prior appropriation doctrine "'provides that a right to water can be established only by putting water to beneficial use and that the first such use in time is the first such use in right.'" *Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 134, 18 P.3d 540 (2001) (quoting Charles B. Roe & Peter R. Anderson, *Water Law*, *in* 1C KELLY KUNSCH, WASHINGTON PRACTICE: METHODS OF PRACTICE § 91.4 (4th ed. 1997)). Once a water right is established by putting the water to a

beneficial use, that right is senior to, and therefore superior to, any water rights established afterward. *Fox*, 193 Wn. App. at 268-69.

The water code establishes a permitting procedure by which individuals seeking to withdraw water for a beneficial use may apply to DOE for a permit to do so. RCW 90.03.260-.340. *Ctr. for Envtl. Law & Policy v. Dep't of Ecology*, 196 Wn. App. 360, 369, 383 P.3d 608 (2016) (*CELP*), summarized the process.

> Once a party has applied for a water right, [DOE] determines what water, if any, is available and finds and determines to what beneficial use or uses it can be applied. If [DOE] is satisfied that water is available and the proposed use is a beneficial use, it issues a permit specifying the amounts of water that can be taken and the beneficial uses to which that water may be applied. RCW 90.03.290 establishes a four part test that [DOE] applies when considering an application for a water right permit. Under the statute, [DOE] must affirmatively find (1) that water is available (2) for a beneficial use and that (3) an appropriation will not impair existing rights or (4) be detrimental to the public welfare.

*CELP*, 196 Wn. App. at 369 (internal citations omitted).

### 2. Water Management

The WRA declares fundamentals of Washington water management. RCW 90.54.020. It states that the utilization and management of Washington waters shall be guided by a number of principles and contains a list of beneficial uses of water, including, as relevant here, domestic use, stock watering, commercial, agricultural, irrigation, fish and wildlife maintenance and enhancement, and preservation of environmental and aesthetic values. RCW 90.54.020(1). The WRA does not specifically prioritize between these many competing beneficial water uses. However, it provides that "[a]llocation of waters among potential uses and users shall be based generally on the securing of the maximum net benefits for the people of the state." RCW 90.54.020(2). Maximum net benefits constitute "total benefits less costs including opportunities lost." RCW 90.54.020(2).

11

Additional water management fundamentals include that "[t]he quality of the natural environment shall be protected and, where possible, enhanced" by retaining base flows of rivers and streams "necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values," but also that "[a]dequate and safe supplies of water shall be preserved and protected in potable condition to satisfy human domestic needs." RCW 90.54.020(3), (5).

In 1997, the legislature enacted the WPA in order to "develop a more thorough and cooperative method of determining what the current water resource situation is in each water resource inventory area of the state and to provide local citizens with the maximum possible input concerning their goals and objectives for water resource management and development." RCW 90.82.005. The WPA provided procedures for local governments and tribes to cooperate with DOE to establish water management plans for their local watersheds. RCW 90.82.040, .060, .080(1)(b).

## II.   MINIMUM INSTREAM FLOWS

Much of the dispute over the Dungeness Rule concerns MIFs and the process required to set them. The Rule established MIFs at levels recommended by the 2005 Elwha-Dungeness Plan for the Dungeness mainstem and eight smaller creeks in the Dungeness basin.

The plaintiffs contend that, before DOE could set these MIFs, DOE was required to perform a maximum net benefits analysis and determine whether the MIFs met the four-part test for new appropriations of water. *See* RCW 90.54.020(2); RCW 90.03.290(3). We disagree.

### A. LEGAL PRINCIPLES

MIFs are appropriations of water for purposes of the water code. RCW 90.03.345. New water use permits must be conditioned to either protect MIFs or require mitigation of impacts to them. RCW 90.03.247(1).

DOE has statutory authority to establish MIFs. The Minimum Water Flows and Levels Act (MWFLA) authorizes DOE to "establish minimum water flows or levels" to protect fish or wildlife, or "whenever it appears to be in the public interest." RCW 90.22.010. MIFs adopted under this statute "shall be provided for through the adoption of rules." RCW 90.22.020. Before establishing a rule setting MIFs, DOE must provide notice to the community and hold a public hearing. RCW 90.22.020.

The WPA also includes a process for establishing MIFs through a "collaborative effort" between DOE and the watershed planning unit. RCW 90.82.080(1)(a)(ii). Once the planning unit has decided to include MIFs, DOE must "undertake rule making to adopt flows," either through the regular or expedited process for adopting rules under the APA, or through a process "that uses public hearings and notice provided by the county legislative authority to the greatest extent possible." RCW 90.82.080(1)(b).

These various water law statutes "plainly provide that *minimum flows*, once established by rule, are *appropriations* which cannot be impaired by subsequent withdrawals." *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 82, 11 P.3d 726 (2000). They are appropriations "subject to the same protection from subsequent appropriators as other water rights." *Postema*, 142 Wn.2d at 82. MIFs for a given stream are "established by administrative rule and have a priority date as of the rule's adoption" and "function in most respects as any other water appropriation." *Foster v. Dep't of Ecology*, 184 Wn.2d 465, 471, 362 P.3d 959 (2015).

B.      MAXIMUM NET BENEFITS

Plaintiffs contend that DOE exceeded its statutory authority by adopting the Dungeness Rule without performing a maximum net benefits analysis. They argue that any time DOE allocates water for any purpose, including MIFs, it must perform a maximum net benefits analysis. We disagree.

The WRA lists guiding principles for water management in Washington. RCW 90.54.020. It begins: "Utilization and management of the waters of the state shall be guided by the following general declaration of fundamentals." RCW 90.54.020. One of these guiding fundamentals states that "[a]llocation of waters among potential uses and users shall be based generally on the securing of the maximum net benefits for the people of the state. Maximum net benefits shall constitute total benefits less costs including opportunities lost." RCW 90.54.020(2).

Other subsections of the same statute demand that "[t]he quality of the natural environment shall be protected and, where possible, enhanced," "[p]erennial rivers and streams of the state shall be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values," and "[l]akes and ponds shall be retained substantially in their natural condition." RCW 90.54.020(3). Additionally, "[a]dequate and safe supplies of water shall be preserved and protected in potable condition to satisfy human domestic needs" and "[w]aters of the state shall be of high quality." RCW 90.54.020(3)(b), (5).

The legislature amended the water code in 1979, adding "maximum net benefits" language to the general statement of Washington water policy. RCW 90.03.005; LAWS OF 1979 ex. s. ch. 216, § 8. The amended policy statement declared that:

> It is the policy of the state to promote the use of the public waters in a fashion which provides for obtaining maximum net benefits arising from both diversionary uses of the state's public waters and the retention of waters within streams and lakes in sufficient quantity and quality to protect instream and natural values and rights.

RCW 90.03.005.

In interpreting the maximum net benefits language of the WRA,[9] we derive its meaning "from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Campbell & Gwinn*, 146 Wn.2d at 11). We avoid reading statutes so as to produce absurd results. *Tingey v. Haisch*, 159 Wn.2d 652, 664, 152 P.3d 1020 (2007).

"[S]tatutory policy statements as a general rule do not give rise to enforceable rights and duties." *Aripa v. Dep't of Soc. & Health Servs.*, 91 Wn.2d 135, 139, 588 P.2d 185 (1978) *overruled on other grounds by State v. WWJ Corp.*, 138 Wn.2d 595, 980 P.2d 1257 (1999). In *Aripa*, the Supreme Court construed the following legislative mandate:

> "The director of institutions shall provide for the establishment of programs and procedures for convicted persons at the state penitentiary, which are designed to be corrective, rehabilitative and reformative of the undesirable behavior problems of such persons, as distinguished from programs and procedures essentially penal in nature."

*Aripa*, 91 Wn.2d at 137 (quoting RCW 72.08.101 (repealed by LAWS OF 1988 ch. 143, § 17)). The plaintiff contended that this statute and another, instructing the Department of Health and Social Services to "'[c]ooperate with public and private agencies in establishing and conducting programs to provide treatment for alcoholics,'" imposed a statutory right to alcoholism treatment while incarcerated. *Aripa*, 91 Wn.2d at 137 (quoting former RCW 70.96A.050(3) (recodified as RCW 71.24.535 by LAWS OF 2016 sp. sess. ch. 29, § 701)). The court concluded that the statutory scheme

---

[9] Although Plaintiffs also cite the maximum net benefits language in the policy statement of the water code, their argument that DOE was required to do a formal maximum net benefits test focuses on the WRA language. Accordingly, we analyze the WRA language and look to the water code policy statement only as context.

was "understandably nonspecific on the precise nature and extent of corrective programs" and did "not give rise to enforceable rights and duties." *Aripa*, 91 Wn.2d at 138-39.

*Swinomish* interpreted the "maximum net benefits" language of the cater code in the context of DOE's attempt to create water reservations for out-of-stream uses. 178 Wn.2d at 595-96. The court observed that "[o]btaining maximum benefits, prudent management of the state's water resources with input of interested entities, preservation of water within streams and lakes as necessary for instream and natural values, and avoidance of wasteful practices are important goals of present water resource management." *Swinomish*, 178 Wn.2d at 596. *Swinomish* also noted that maximum net benefits refers to both diversionary uses, which can be quantified in dollars, but also high water quality and aesthetic values, which cannot be economically quantified. 178 Wn.2d at 600.

Plaintiffs contend that use of the word "shall" indicates that the legislature intended to impose a mandatory duty upon DOE to secure the maximum net benefits. The word "shall" appears 22 times in RCW 90.54.020. Some examples include the WRA's declarations that "[t]he quality of the natural environment *shall* be preserved"; "[p]erennial rivers and streams of the state *shall* be retained with base flows"; "[l]akes and ponds *shall* be retained substantially in their natural condition"; "[w]aters of the state *shall* be of high quality"; DOE, other state agencies, and local governments "*shall* evaluate the potential for the development of new storage projects and the benefits and effects of storage in reducing damage to stream banks and property"; "[a]dequate and safe supplies of water *shall* be preserved and protected in potable condition to satisfy human domestic needs." RCW 90.54.020(3), (4), (5) (emphasis added). If the legislature's use of the word "shall" imposed a formal test on DOE before it allocated any amount of water, DOE would

16

be overwhelmed with countless conflicting tests and unable to perform its water management duties. We reject this argument because it would lead to an absurd result.

When the legislature intends to impose a specific balancing test on DOE, it has shown that it knows how to do so. For example, the water code establishes a four-part test DOE must apply when considering new water permits. That statute states:

> [DOE] shall make and file as part of the record in the matter, written findings of fact concerning all things investigated, and if it shall find that there is water available for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare, it shall issue a permit stating the amount of water to which the applicant shall be entitled and the beneficial use or uses to which it may be applied.

RCW 90.03.290(3).

If the legislature meant to require DOE to make specific maximum net benefits findings for every allocation of water, it could have used similar language to that in the water code, requiring DOE to "make and file as part of the record" a written maximum net benefits finding. It did not do so because the maximum net benefits language of the WRA instructs DOE how to generally exercise its discretion and expertise in water management. It does not impose a formal test.

C.   FOUR-PART APPROPRIATIONS TEST

Plaintiffs contend that DOE exceeded its statutory authority by appropriating water for instream flows without applying the water code's four-part test for new appropriations. They contend that instream flows are water appropriations with priority dates that must go through the same process as any other water appropriation. We disagree.

When evaluating applications for water appropriations, the water code instructs DOE to verify that the permit satisfies four criteria: "(1) water is available for appropriation (2) for a

17

beneficial use and (3) an appropriation will not impair existing rights or (4) be detrimental to the public welfare." *Foster*, 184 Wn.2d at 472; *see* RCW 90.03.290(3).

Earlier subsections of this statute clarify that it specifically concerns applications to appropriate water. When an application complying with the water code and applicable rules has been filed, subsection (1) directs DOE to "investigate the application, and determine what water, if any, is available for appropriation, and find and determine to what beneficial use or uses it can be applied." RCW 90.03.290(1). Another subsection details the process for issuance of preliminary permits when a water right application fails to furnish sufficient information for DOE to issue a permanent appropriation permit. RCW 90.03.290(2).

As discussed above, DOE's authority to establish MIFs comes from multiple sources, all of which use a different process than the water code's applications to appropriate water. The MWFLA gives DOE authority to establish MIFs "for the purposes of protecting fish, game, birds or other wildlife resources, or recreational or aesthetic values . . . whenever it appears to be in the public interest." RCW 90.22.010. It also specifies that MIFs should be established "through the adoption of rules" and provides several procedural requirements, including a public hearing with notice to the affected community. RCW 90.22.020

In this case, DOE's MIF authority derives from the WPA, which allows it to set MIFs based on the recommendation of a Watershed Plan through an expedited process sidestepping many APA procedural requirements. *See* RCW 90.82.080(1)(b). This provision includes many procedural safeguards, including that DOE may only promulgate rules under this statute if the local governments in the area agree to set MIFs and create a formal watershed plan. RCW 90.82.080.

Regardless which MIF authority DOE invoked in this case, application of the four-part test for new water appropriations is inconsistent with the purpose of MIFs. The first part of the test

18

inquires whether water is "available for appropriation." RCW 90.03.290(3). The very purpose of establishing MIFs is to ensure that water remains available in the basin. If water must be available for DOE to establish MIFs, DOE would be unable to use them when they are most vital to protect instream values and resources.

Plaintiffs emphasize that MIFs are "appropriations" within the meaning of the water code and thus must be subject to the four-part test. Plaintiffs are correct that, "[o]*nce established*, a minimum flow constitutes an appropriation with a priority date as of the effective date of the rule establishing the minimum flow." *Postema*, 142 Wn.2d at 81 (emphasis added). However, the process for establishing MIFs is very different than that for granting an appropriation permit under RCW 90.03.290's appropriation procedures.

Plaintiffs also compare MIFs to reservations, which must "meet the same requirements as any appropriation of water under the water code." Br. of Appellant at 27 (quoting *Swinomish*, 178 Wn.2d at 588) (emphasis omitted). Although the same water code section clarifies that both reservations and MIFs are appropriations, that does not suggest that they are created the same way. *See* RCW 90.03.345; RCW 90.54.050; RCW 90.82.080. Unlike MIFs, reservations involve withdrawal of water for out-of-stream use. Determining whether water is "available" for such out-of-stream uses makes sense, as it would with a permit application. This reasoning does not apply to MIFs, where requiring water availability would defeat their very purpose.

We conclude that DOE may exercise its authority to set MIFs without resorting to the four-part test for evaluation of water appropriation permits.

III.     RESERVES AND OCPI EXCEPTION

The Dungeness Rule established reserves of water, not subject to MIFs, specifically for domestic use. DOE found that these reserves served overriding considerations of public interest.

WAC 173-518-080(1); *see* RCW 90.54.020(3)(a). If domestic water users complied with a list of specific conditions, they could use reserve water despite potential impacts to the MIFs. WAC 173-518-080.

Plaintiffs claim that DOE exceeded its statutory authority by establishing these reserves. They contend that the legislature's express approval of the Dungeness Rule's water reserves does not cure this defect because it does not address conflicting case law from *Swinomish* and *Foster* relating to the overriding considerations of public interest exception. In the alternative, they contend that reading the express legislative approval of the Dungeness Rule as determinative of this case would violate separation of powers. We reject these contentions.

The WRA provides DOE the authority to "[r]eserve and set aside waters for beneficial utilization in the future." RCW 90.54.050(1). These reservations constitute appropriations within the meaning of the water code with priority dates as of the effective dates of their establishment. RCW 90.03.345. DOE creates these reservations by administrative rule. RCW 90.54.050.

Once MIFs are established for a body of water, they are appropriations "which may not be impaired" by subsequent withdrawals. *Postema*, 142 Wn.2d at 81. The "narrow exception to this rule is found in RCW 90.54.020(3)(a), which provides that withdrawals of water which would conflict with the base flows 'shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served.'" *Postema*, 142 Wn.2d at 81 (quoting RCW 90.54.020(3)(a)). This provision of RCW 90.54.020(3)(a) is known as the overriding considerations of public interest (OCPI) exception.

In *Swinomish*, DOE relied on the OCPI exception to create water reservations that would have allowed out-of-stream uses conflicting with preexisting MIFs. 178 Wn.2d at 576. DOE found that "important public interests would be significantly advanced by the reservations because

without them, new withdrawals for domestic, municipal, industrial, agricultural, and stock watering uses would be interrupted when stream flows fall" to the MIF levels. *Swinomish*, 178 Wn.2d at 579. DOE used a balancing test to determine whether beneficial uses of water would outweigh the harm resulting from impairing instream flows. *Swinomish*, 178 Wn.2d at 586.

The Supreme Court invalidated the reservations, concluding that DOE's interpretation of the OCPI exception "would relegate minimum flow water rights to a lesser class of water right than others, with the water subject to reallocation if [DOE] decides that reservations for other beneficial uses would make better use of the state's water." *Swinomish*, 178 Wn.2d at 596. The court concluded that the OCPI exception "cannot reasonably be read to replace the many statutes that pertain to appropriation of the state's water and minimum flows." *Swinomish*, 178 Wn.2d at 598. It noted that allowing DOE to use the OCPI exception to provide water for domestic wells or other specific uses would allow DOE to avoid the normal statutory procedures and the prior appropriation doctrine. *Swinomish*, 178 Wn.2d at 598.

In *Foster*, the City of Yelm sought an appropriation permit that would impair MIFs. 184 Wn.2d at 469. DOE issued the permit pursuant to the OCPI exception, conditioned on Yelm's application for an extensive mitigation plan which would offset the impacts of the new appropriation. *Foster*, 184 Wn.2d at 469.

The Supreme Court distinguished "withdrawals of water," as used in the OCPI exception, from "appropriations" of water, as used elsewhere throughout various water law statutes. *Foster*, 184 Wn.2d at 473-74. It held that "the OCPI exception does not allow for the *permanent* impairment of minimum flows" because it allows for "withdrawals," or the "physical act of removing water," as opposed to "appropriations," which would be permanent water rights. *Foster*, 184 Wn.2d at 474-75 (emphasis added). *Foster* held that the OCPI exception allows "only

temporary impairment of minimum flows" and that "[m]unicipal water needs do not rise to the level of 'extraordinary circumstances'" required to apply the OCPI exception. 184 Wn.2d at 477.

In this case, DOE "weighed the public interest supported by providing a limited amount of water for domestic water supply against the potential for negative impact to instream resources." WAC 173-518-080. It found that the public interest advanced by the reserves "clearly overrides the potential for negative impacts on instream resources." WAC 173-518-080. In making this decision, DOE cited the OCPI exception.[10] DOE distinguishes *Swinomish* and *Foster* on the basis that the rules invalidated in those cases used the OCPI exception to appropriate water *after* MIFs were already established. It claims the rule in this case avoids those problems by adopting MIFs and reserves of water simultaneously, such that neither is superior to the other for purposes of prior appropriation doctrine.

DOE's argument fails to account for the express holding of *Foster* that "the OCPI exception does not allow for the permanent impairment of minimum flows." 184 Wn.2d at 475. This holding is not dependent on prior appropriation doctrine, but the OCPI exception's use of the word "withdrawal" rather than "appropriation." *Foster*, 184 Wn.2d at 474. DOE may not use the OCPI exception to permanently impair MIFs, regardless of when it does so. Our analysis does not end here, however, because the legislature has expressly approved of the Dungeness Rule's water reserves.

---

[10] The Dungeness Rule invokes the OCPI exception and both parties assume that DOE relied on the OCPI exception for its establishment of reserves. *See* WAC 173-518-080(1). We assume that DOE relied on the OCPI exception to adopt these reserves, and do not address whether DOE had the authority to establish these reserves through other statutory authority.

After both *Foster* and *Swinomish* had been decided, the legislature announced its express approval of the Dungeness Rule's water reservations. It declared:

> [DOE] shall act on all water rights applications that rely on the reservations of water established in WAC 173-518-080 or 173-545-090, as those provisions existed on March 31, 2016. The legislature declares that the reservations of water established in WAC 173-518-080 and 173-545-090, as those provisions existed on March 31, 2016, are consistent with legislative intent and are specifically authorized to be maintained and implemented by [DOE].

RCW 90.54.210(1). The same statute also cautioned that "[t]his section does not affect [DOE's] authority to lawfully adopt, amend, or repeal any rule, including WAC 173-518-080 or 173-545-090. RCW 90.54.210(2). WAC 173-518-080 is the section of the Dungeness Rule that established water reserves pursuant to the OCPI exception.

We read statutes together to "determine the legislative intent underlying the entire statutory scheme." *In re Estate of Kerr*, 134 Wn.2d 328, 343, 949 P.2d 810 (1998). "A more specific statute supersedes a general statute only if the two statutes pertain to the same subject matter and conflict to the extent they cannot be harmonized." *Kerr*, 134 Wn.2d at 343. In this case, as applied to the Dungeness Rule, RCW 90.54.210 conflicts with the OCPI exception as the Supreme Court interpreted it in *Foster*.

Both *Swinomish* and *Foster* observed that the goal of statutory interpretation is to effectuate legislative intent. 178 Wn.2d at 581; 184 Wn.2d at 471. The express statement of legislative intent controls in this case. While DOE may not be able to generally use the OCPI exception to establish reserves that permanently impair instream flows, the legislature superseded the holding of *Foster* as to the specific rules it mentions in RCW 90.54.210. Accordingly, use of the OCPI exception to establish water reserves that may impair MIFs was within DOE's statutory authority in this case.

Plaintiffs contend that RCW 90.54.210 violates the separation of powers by directing the outcome of this case, which was pending at the time the statute was adopted.

"Occasionally, try as the court may, the legislature is disappointed with the court's interpretation." *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 509, 198 P.3d 1021 (2009). In *Hale*, the trial court applied the statutory meaning of "disability" in the Washington Law Against Discrimination as the Supreme Court had interpreted it in *McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006). 165 Wn.2d at 499. The legislature then enacted a new definition of "disability" with express retroactive effect. 165 Wn.2d at 500. At the time the bill passed, the plaintiff's claim had already been dismissed, based on the *McClarty* interpretation. *Hale*, 165 Wn.2d at 499-500. The plaintiff filed a motion for reconsideration based on the new statutory definition, and the trial court denied it, concluding that the new definition violated the separation of powers doctrine "by attempting to reverse th[e] court's interpretation." *Hale*, 165 Wn.2d at 500.

The Supreme Court reversed, concluding that the legislature had "acted wholly within its sphere of authority to make policy, to pass laws, and to amend laws already in effect." *Hale*, 165 Wn.2d at 509. The legislature "exercised its authority to amend the act and change the definition of 'disability' retroactively" while being "careful not to reverse" *McClarty* and without interfering in any judicial function. *Hale*, 165 Wn.2d at 510.

In this case, like *Hale*, the legislature enacted a new statute in response to the opinions in *Swinomish* and *Foster*. The legislature did not redefine the word "withdrawal" or expressly reverse either of those decisions. Rather, it expressed that the reserves in two specific rules were consistent with legislative intent and directed they be maintained. This was wholly within the legislature's sphere of authority and does not violate the separation of powers.

We conclude that the Dungeness Rule's water reserves are consistent with express legislative intent and DOE did not exceed its authority by adopting them.

IV.    SURFACE WATER CLOSURE

Because of water scarcity, the Rule closed the Dungeness basin to new appropriations from all tributaries year-round, and from the Dungeness mainstem for four months out of the year. WAC 173-518-050. Plaintiffs contend that these closures exceeded DOE's statutory authority. They contend that DOE may only close a basin when it lacks information and data. Accordingly, they argue that DOE's closure of the basin based on its affirmative findings that water is unavailable exceeded its statutory authority. We disagree.

DOE has authority to close streams to further appropriation. *Postema*, 142 Wn.2d at 95 (citing RCW 43.21A.064(9); RCW 43.27A.090(7), (11); RCW 90.54.040; RCW 90.03.247); *see also Whatcom County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 186 Wn.2d 648, 677, 687 n.13, 381 P.3d 1 (2016) (assuming DOE has authority to "close a basin to all future appropriations"). In *Postema*, DOE adopted rules closing certain streams following a determination that water was unavailable from the surface water source. 142 Wn.2d at 95. The court upheld these rules, noting that "[s]tream closures by rule embody [DOE's] determination that water is not available for further appropriations." *Postema*, 142 Wn.2d at 95. "[I]f and when [DOE] makes a determination to close a basin to all future appropriations, including permit-exempt appropriations, this positive action by [DOE] amounts to a recognition that water is not available for any use." *Whatcom County*, 186 Wn.2d at 687 n.13.

Plaintiffs attempt to distinguish *Postema* on grounds that it considered the application of a rule to specific permit applications, not the validity of the rule itself. They further claim that *Postema* "includes no analysis of the specific rulemaking requirements for closing streams by rule, or the statutory authority for adopting individual stream closures by rule." Br. of Appellant at 34-35.

*Postema* cites four statutory sections for DOE's authority to close basins. 142 Wn.2d at 95. These sections give DOE authority to "establish and promulgate rules governing the administration" of the water code, RCW 43.21A.064(9), to "develop and implement . . . a comprehensive state water resources program which will provide a process for making decisions on future water resource allocation and use," RCW 90.54.040(1), and to set MIFs. RCW 90.03.247; *see also* RCW 43.27A.090(7), (11).

In the Dungeness Rule, DOE determined that, "based on recommendations in the watershed plan, historical and current low stream flows, and the need to protect existing water rights, water is not reliably available for new consumptive uses from the streams and tributaries in the Dungeness River watershed." WAC 173-518-050. Accordingly, it closed eight specific named tributaries and all unnamed tributaries to the Dungeness River to new appropriations year-round. WAC 173-518-050; Table III. It also closed the Dungeness River itself to new appropriations from July 15 through November 15 each year. WAC 173-518-050; Table III. The only exceptions to these closures concerned use of the groundwater reserve or compliance with the groundwater appropriation section of the rule. WAC 173-518-050 (citing WAC 173-518-070, 080, 085).

These closures are consistent with the broad rulemaking authority delegated to DOE in both RCW 43.21A.064(9) and RCW 90.54.040(1). Though plaintiffs' claim *Postema* offers no guidelines for DOE to promulgate rules closing a river basin, they do not suggest any reason that standard APA rulemaking procedures would not be applicable.[11] *See* ch. 34.05 RCW.

---

[11] Plaintiffs emphasize that DOE may only close basins under RCW 90.54.050 "[w]hen sufficient information and data are lacking to allow for the making of sound decisions" and therefore contend that DOE may only ever close basins under such conditions. Br. of Appellant at 35-36 (emphasis omitted). This argument ignores *Postema* and many other sources of statutory rulemaking authority discussed in the main text.

Pursuant to *Postema* and DOE's broad authority to implement water management rules under numerous interrelated statutes, DOE did not exceed its authority by closing the Dungeness Basin to surface water withdrawals.

V.     PERMIT-EXEMPT WELLS

The parties dispute several aspects of the Dungeness Rule's impacts to PE wells. Plaintiffs claim that the priority date for PE wells relates back to initiation of any project dependent on the well for water and that DOE failed to consider the cost of the lost "rights" to drill PE wells in its CBA and LBA analysis.

DOE responds that rights to PE well water are not established until the person claiming the right has put the water to a beneficial use. It additionally contends that the CBA and LBA analysis were optional because the Dungeness Rule was not a significant legislative rule. We agree with DOE.

A.     LEGAL PRINCIPLES

In 1945, the legislature recognized the relationship between surface water and groundwater. RCW 90.44.030. It began requiring permits for appropriation of groundwater. RCW 90.44.050. Before issuing a groundwater permit, DOE must investigate and apply the four-part test from RCW 90.03.290. *Campbell & Gwinn,* 146 Wn.2d at 8. "[W]hen [DOE] determines whether to issue a permit for appropriation of public groundwater, [it] must consider the interrelationship of the groundwater with surface waters, and must determine whether surface water rights would be impaired or affected by groundwater withdrawals." *Postema*, 142 Wn.2d at 80-81.

The groundwater statute forbids any withdrawal of groundwater without a permit. RCW 90.44.050. However, it exempts withdrawals for stock-watering, watering small lawns or gardens,

single or group domestic uses, or industrial purposes that do not exceed 5,000 gallons per day. RCW 90.44.050. Withdrawals of groundwater that meet these requirements are referred to as "permit-exempt wells." These wells are exempt from permitting requirements and, "to the extent that [the water] is regularly used beneficially," the user is "entitled to a right equal to that established by a permit." RCW 90.44.050.

PE wells are subject to the prior appropriation doctrine, like any other water right. *Fox*, 193 Wn. App. at 262. "[A]n appropriator's right to use water from a permit-exempt withdrawal is subject to senior water rights, including the minimum flows established by [DOE]." *Whatcom County*, 186 Wn.2d at 669.

B.    PRIORITY DATE

Plaintiffs contend that the priority date for water rights relates back to the date the process for putting water to a beneficial use began. They claim that DOE exceeded its statutory authority by evaluating the priority date for PE wells as the date the water is actually put to beneficial use. We disagree.

The prior appropriation doctrine "does not permit any impairment, even a de minimis impairment, of a senior water right." *Foster*, 184 Wn.2d at 471. The Dungeness Rule states that it applies to the "use and appropriation of surface and groundwater in the Dungeness River watershed begun after" its effective date, but does not affect "[e]xisting groundwater rights established under the groundwater permit-exemption where regular beneficial use began before" the rule's effective date. WAC 173-518-010(3).

The Dungeness Rule may not impair water rights already existing at the time it went into effect. *See Foster*, 184 Wn.2d at 473 (observing DOE's "end run" around the normal process, conflicting with prior appropriation doctrine). We must determine whether the Dungeness Rule

may apply to prospective PE well users who had already drilled or planned to drill a well, but who had not yet put water from the well to "regular beneficial use."

The water code specifically provides that water right priority dates "relate back to the date of filing of the original application with [DOE]." RCW 90.03.340. Because PE wells have no "original application" date, prospective users of PE well water must "show 'an intention to appropriate [water] followed by a reasonable diligence in applying the water to a beneficial use.'" *Fox*, 193 Wn. App. at 276-77 (quoting *In re Rights to Waters of Alpowa Creek*, 129 Wash. 9, 13, 224 P. 29 (1924)). If they can meet this two part test, "the date of priority of the right will 'relate[] back' to the time work was first performed to appropriate the water."[12] *Fox*, 193 Wn. App. at 277 (quoting *Hunter Land Co. v. Laugenour*, 140 Wash. 558, 565, 250 P. 41 (1926)).

MIFs provide an exception to the statutory relation-back doctrine. *Postema*, 142 Wn.2d at 80 n.2. Although "[n]ormally, the priority date for a water right . . . relates back to the date of application for the permit . . . where minimum flow or levels have been adopted and are in effect when a permit to appropriate is granted, the permit must be conditioned to protect the flows or levels." *Postema*, 142 Wn.2d at 80 n.2. *Swinomish* reaffirmed that the relation-back doctrine does not apply when appropriation would conflict with MIFs. 178 Wn.2d at 591 n.9 ("[T]he date the permit is approved, not the date of application, determines the priority date of the permit to appropriate and consequently whether the water right obtained under the permit is subject to the minimum flows or levels."); *cf* RCW 90.03.340.

The Dungeness Rule applies to use and appropriation of water in the Dungeness Basin "begun after the effective date" of the rule. WAC 173-518-010(3). No provision of the rule

---

[12] Although the statutory relation-back doctrine applies specifically to applications for water rights, courts have also recognized a common law relation-back doctrine for PE wells. *Fox*, 193 Wn. App. at 276-77; *see also Alpowa Creek*, 129 Wash. at 13.

affected any water right previously existing at the time the rule went into effect, including existing groundwater rights established through PE wells "where regular beneficial use began before the effective date" of the rule. WAC 173-518-010(3)(a), (b).

The priority date of specific PE wells would depend on a fact-specific inquiry looking to both the intention to appropriate and reasonable diligence in applying the water to a beneficial use. *Fox*, 193 Wn. App. at 276-77. However, to the extent any appropriations may interfere with MIFs set in the Dungeness Rule, the relation-back doctrine does not apply, pursuant to *Postema* and *Swinomish*. 142 Wn.2d at 80 n.2; 178 Wn.2d at 591 n.9. Based on the foregoing, the priority date for new PE wells that conflict with MIFs is the date when water is first put to a beneficial use.

C.      COST-BENEFIT ANALYSIS AND LEAST BURDENSOME ALTERNATIVES

Plaintiffs claim that DOE erred in its CBA and LBA analyses by refusing to consider the "cost" of lost legal rights for potential drillers of future PE wells. They claim that DOE erred by refusing to assign any value to the "right" to drill a PE well in the Dungeness basin, and thus erred by failing to consider the cost of these lost rights in its CBA and LBA. Because the Dungeness Rule was not a "significant legislative rule," DOE was not required to perform a CBA or LBA analysis.

The APA provides a list of procedural requirements state agencies must follow before adopting a "significant legislative rule." RCW 34.05.328(1). These requirements include a determination that the probable benefits of the rule are greater than its probable costs and that the rule is the least burdensome alternative that will achieve the general goals and specific objectives it seeks to accomplish. RCW 34.05.328(1)(d), (e).

A "significant legislative rule" is one that "adopts substantive provisions of law pursuant to delegated legislative authority, the violation of which subjects a violator of such rule to a penalty

30

or sanction" or that "establishes, alters, or revokes any qualification or standard for the issuance, suspension, or revocation of a license or permit." RCW 34.05.328(5)(c)(iii). The Dungeness Rule clearly meets this definition. It adopts numerous substantive provisions of law, including MIFs, closure of the basin to new withdrawals, and metering and mitigation requirements. However, the WPA provides an exception to the normal definition of "significant legislative rule."

Under the WPA, DOE may use an expedited rulemaking process when setting MIFs set in accordance with watershed plans. RCW 90.82.080. When utilizing this process, DOE may use the standard APA rulemaking process, an expedited APA process, or a process "that uses public hearings and notice provided by the county legislative authority to the greatest extent possible." RCW 90.82.080(1)(b). Rules adopted under this section "do not constitute significant legislative rules." RCW 90.82.080(1)(b).

A "central purpose" of the Elwha-Dungeness Plan was to establish MIFs and the plan proposed specific instream flow numbers for numerous streams in the basin, including the Dungeness mainstem. Each MIF established by the Dungeness Rule is identical to the recommended MIF proposed in the plan. WAC 173-518-040, Table II.

The plan also provided many recommendations besides MIFs. It recommended continued groundwater withdrawals be conditioned on mitigation to surface water impacts and increased regulation of PE wells. It suggested creation of a groundwater reserve to facilitate land use planning, managed growth, and protection of instream flows. It also recommended that, for new wells, it be made clear "that the date of priority . . . of a water right is the date the water is put to beneficial use, not the date the well was drilled." ECY070408.

The plan additionally recommended establishment of a "limited groundwater reserve" to keep some available water for future appropriation. ECY070402. DOE implemented this

recommendation with its creation of reservations of water for domestic use, not subject to MIFs. WAC 173-518-080.

Both the Plan and the Rule contemplated creation of MIFs, priority dates for PE wells based on when water is put to a beneficial use, and establishment of water reserves. To the extent plaintiffs have identified minor discrepancies between the Plan and the Rule, the overall character and purpose of the rule was still to enact the recommendations of the plan. DOE used the Plan as "the foundation" for developing the Rule.[13] AR at ECY002041.

DOE adopted the Dungeness Rule pursuant to its authority to establish MIFs consistent with watershed plans under the WPA. Consequently, the Rule is not a "significant legislative rule" and DOE was not required to perform a CBA or LBA analysis.

VI.    ARBITRARY AND CAPRICIOUS

Finally, plaintiffs claim that the Dungeness Rule is arbitrary and capricious for many of the same reasons discussed above. They claim it was arbitrary and capricious because DOE did not make maximum net benefits findings, did not consider public interest under the four-part test for new appropriations, and appropriated more water for fish than naturally exists in the basin. They additionally claim DOE was arbitrary and capricious by foreclosing future domestic use, approving a mitigation plan before acquiring year-round mitigation, and "attempt[ing] to make new law regarding the priority date of [PE] wells." Br. of Appellant at 47-48. We disagree.

Agency action is arbitrary and capricious when "it is willful and unreasoning and taken without regard to the attending facts or circumstances." *Wash. Indep. Tel. Ass'n v. Wash. Utils. &*

---

[13] Specifically, plaintiffs argue that the Rule's implementation of maximum depletion amounts triggering denial of new water uses was nowhere to be found in the Plan. This section of the rule is a natural corollary to enforcement of MIFs, one of the central tenets of the Rule and Plan both, and does not prevent DOE from exercising its WPA rulemaking authority.

*Transp. Comm'n*, 148 Wn.2d 887, 905, 64 P.3d 606 (2003). When "there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). When a rule is challenged as arbitrary and capricious, "the reviewing court must consider the relevant portions of the rule-making file and the agency's explanations for adopting the rule as part of its review." *Wash. Indep. Tel. Ass'n*, 148 Wn.2d at 906.

"When an agency acts within its authority, a rule is presumed to be valid and, therefore, the 'burden of demonstrating the invalidity of agency action is on the party asserting the invalidity.'" *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 378, 216 P.3d 1061 (2009) (quoting RCW 34.05.570(1)(a)).

DOE adopted the Dungeness Rule to "meet statutory obligations to manage waters for public use and for the protection of instream flows" and to adopt the recommendations of the Elwha-Dungeness Plan. AR at ECY001839. In order to meet these goals, DOE adopted each of the provisions laid out above, as well as requiring metering for all water use in the Dungeness Basin, establishing maximum depletion amounts to limit adverse impacts caused by new mitigated appropriations, and adopting several other water management provisions not raised by plaintiffs. Ch. 173-518 WAC.

As the Elwha-Dungeness Planning Unit and DOE found, "stream flow with existing uses is considerably lower than stream flow needed to meet biological needs." AR at ECY001839. In its initial rulemaking order, DOE stated that "adoption of this water management rule is needed to protect instream values within the Dungeness watershed, avoid injury to existing water rights from future appropriations of water, and implement recommendations of the Elwha-Dungeness Watershed Plan." AR at ECY071270.

Plaintiffs do not cite the record or any authority outside the general standard for arbitrary and capricious agency action and two rudimentary water law statues. The burden is on plaintiffs to show that the rule is arbitrary and capricious. RCW 34.05.570(1)(a). Here, where they have simply reframed their earlier arguments without any citation to authority, plaintiffs have failed to meet that burden.

CONCLUSION

Plaintiffs have not shown that DOE exceeded its statutory authority in adopting the Dungeness Rule, nor that the rule is arbitrary and capricious. We uphold the rule and affirm the trial court's dismissal of the case.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Maxa, C.J.